Delores CLARK et al., Appellants,

v.

The **BOARD OF EDUCATION OF the LITTLE ROCK SCHOOL DISTRICT** et al., Appellees.

No. 18368.

United States Court of Appeals Eighth Circuit.

March 31, 1967.

John Walker, Harold Anderson, Little Rock, Ark., and Jack Greenberg, James M. Nabrit, III, Michael Meltsner and Henry Aronson, New York City, for appellants.

Before VOGEL, Chief Judge, GIBSON, Circuit Judge, and REGISTER, District Judge.

GIBSON, Circuit Judge.

Appellants have filed a petition for rehearing. Though nearly all of petitioners' original objections to the Board's plan were sustained by us, petitioners complain about our approval of that portion of the school desegregation plan that provides for annual rights to laterally transfer schools, exercisable at the discretion of the individual student. They argue that the annual choice should be a mandatory choice required every year of all students. They give two primary reasons for seeking a rehearing in this case: (1) The Fifth Circuit's recent opinion in United States v. Jefferson County Board of Education, 5 Cir., 372 F.2d 836 (Dec. 29, 1966), which adopted the Guidelines of the Department of Health, Education and Welfare; and in so doing demanded that all freedom of choice plans include *mandatory* annual choice; and (2) The allegedly erroneous conclusions of this Court in assessing the effect of a nonmandatory annual choice to laterally transfer schools.

Having carefully considered petitioners' arguments, it is the opinion of this Court that a rehearing on this subject would serve no significant purpose.

We are once again urged to adopt the H.E.W. Guidelines as our absolute pole star for determining constitutional rights and duties in the area of school desegregation. This, we cannot do. We stated in the past that it is the function of the courts, and the courts alone, to determine when state action deprives individual citizens of their right to equal protection and due process of law as guaranteed by the Fourteenth Amendment. Kemp v. Beasley, 352 F.2d 14 (8 Cir. 1965). The establishment or reduction of constitutional rights cannot be accomplished either by congressional action or executive fiat. This is perhaps the most fundamental concept of constitutional supremacy. We have great respect for the expertise of the Department of Health, Education and Welfare, and its Guidelines are most useful to courts and school districts in framing acceptable plans. However, our respect for this De-

partment does not demand that we abdicate to it the responsibility for determining proper standards of constitutional protection. A step in that direction would be to breach the carefully guarded wall that separates the three fundamental powers of governmental action.

■ If a court's view of constitutional requirements results in federal funds being channeled to where the legislative branch feels they are unwarranted, this is a defect that must be cured by the administrative and legislative branches of our Government. That problem should not be met by the Court's altering its standards of constitutional protections so that these protections might correspond to the present policy of an administrative agency. If we accept this "easy" remedy to the proper allocation of federal funds, we would be accepting the position that the flow of federal money is the final arbiter of constitutionally protected rights.

No doubt some recalcitrant school boards may try to use the courts to uphold minimal plans of integration that are long on form and short on substance in order to receive federal funds. But when this is attempted, the courts are not powerless to act. The District Court has equitable powers to see either that the proposed plan does work to accord constitutional guarantees and that if it does not, to make any further orders necessary to effectuate a constitutional plan.

■ We have again carefully examined the freedom of choice plan that is before us. Notwithstanding the H.E.W. Guidelines and the recent opinion of the Fifth Circuit, when a student is given a well publicized annual right to enter the school of his choice, coupled with periodic mandatory choices as set forth in the Board's amended plan, we can find on the face of it no unconstitutional state action. We find no state act that results in discrimination against Negroes. On its face, we believe that the plan, as approved by us, is proper and constitution-

al, and appellants have made no showing that this non-mandatory freedom of choice plan to laterally transfer schools has infringed their constitutional rights. If the plan is administered and operated so as to affect their constitutional rights to attend a racially nondiscriminatorily operated school system, a different question would be presented.

■ The breadth and depth of the segregation problem varies in different states and in different parts of the same state. Therefore, we can have no quarrel with the Fifth Circuit's 2-to-1 decision in United States v. Jefferson County Board of Education. If the majority of the Judges, in *Jefferson County*, believe the H.E.W. Guidelines are the minimum necessary to meet the constitutional mandate of a "unitary, non-racial system" in their Circuit, we feel that is a matter for their sole consideration. As problems vary in different parts of the country, of necessity the courts' orders to effectuate a common goal will also be varied. The Fifth Circuit has borne the brunt of the school desegregation cases and its judgment merits our respect and admiration for their devotion to this admittedly difficult task. However, our factual situation is not the same as theirs. *Jefferson County* is still dealing with dual attendance zones. We are not. A much greater degree of integration has been achieved in Arkansas than in the States directly concerned in the *Jefferson County* decision. We don't think we should flatly condemn a freedom of choice plan, as proposed by the Board, which does give an annual freedom of choice to laterally transfer schools to each student, subject only to conditions of overcrowding. We feel the plan should be given an opportunity to work.

In passing, we desire to note that we only gave provisional approval to the freedom of choice method in *Kemp*, which was actually all we could do at that time in giving court sanction for such a procedure. If the freedom of choice plan does not work, the District Court and this Court will have to discard such plan as unsuitable in providing the constitu-

tional guarantees that should be universally accorded all students.

■ Petitioners have argued, as their second point, that should a given school be filled to capacity, Negro children who might wish to transfer to the filled schools would be "locked" to their choice of past years. This argument is further premised, as it must be, on the assumption that white children who live at a distance greater than the Negro children were permitted to attend the school. Petitioners argue this is unconstitutional, and this defect should invalidate the non-mandatory choice provisions of the plan.

A close examination of this argument discloses exactly what petitioners are asking us to do. They are asking us to look at this hypothetical situation which they have constructed for us and rule that should this situation ever present itself the operation of the lateral transfer provisions of the plan would result in unconstitutional discrimination. After we have ruled that in this situation the lateral transfer provisions would be unconstitutional, petitioners want us to use this as a basis for striking down the general lateral transfer provisions as they appear on the face of the plan and as they would be applied under all other circumstances. For two reasons, we cannot do as petitioners ask.

Petitioners have done nothing more than present us with an interesting hypothetical situation that could arise under the future operation of the plan, and which presents an interesting and undecided question of constitutional law. However, none of the petitioners is confronted with this situation. They have made no showing of the capacity and enrollment of the individual schools in the Little Rock System. There is no indication what schools will be chosen by the children in the years to come. There is no indication after the initial choices are made how many of the children, if any, will want to make lateral transfers, or to what schools they may wish to transfer. In short, there is absolutely no indication that the students who wish to laterally transfer cannot and will not be fully accommodated. Finally, there is no basis at this time for any argument that, should transfers be denied, the result would *necessarily* be unlawful discrimination. The record discloses none.

There is no individual or group that has been or necessarily will be treated as petitioners hypothesize. Obviously, in such a situation there is no "case or controversy" which would enable this or any other court to act. Local No. 8–6, Oil, Chemical and Atomic Workers International Union v. Missouri, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960).

■ Further, even if we were able to assume that there was some merit in petitioners' hypothetical argument, which we cannot, it is clearly misdirected at this time. Our approval of the Board's plan is a provisional approval, limited, as it must be, to examination of, and judgment upon, the face of the plan. As all the individual petitioners have been afforded their requested relief, any attacks on the plan must be directed to its fundamental characteristics. The attack must show that the plan is unconstitutional on its face, unconstitutional *per se*. To do this, petitioners must show that under any application of the plan's provisions the members of petitioners' class would be deprived of their constitutional rights to attend school on a non-racial basis.

■ Such an attack has not and we believe cannot be made on the plan's non-mandatory choice rights. Petitioners' objection is premised solely upon the denial of a choice under the facts hypothesized by them. Therefore, if in fact all the students wishing to transfer were fully accommodated, the Constitution would unquestionably be satisfied, and apparently under these circumstances petitioners would have little objection to the plan's operation. From this, it is clear to us that this plan can easily have an unchallenged constitutional operation. Consequently, it is not subject to attack on its face.

We, of course, recognize that this plan, as any plan, is subject to abuse. In the same manner, we recognize that under a particular set of future circumstances the day-by-day operation of the plan might give rise to undecided questions of constitutional law. It is for this very reason we directed the District Court to retain jurisdiction over this cause in order that these questions might be answered as they arise. However, the mere possibility of abuse, or the ability of a party to envision a hypothetical question of constitutional law that may never arise, cannot be used to destroy a plan that can otherwise be constitutionally applied. If such an exacting standard were required, it would be a rare plan, indeed, that could pass constitutional muster.

If and when a student is denied a request to transfer under the facts hypothesized by petitioners, the trial court will be free to entertain questions as to whether the denial resulted in a violation of the student's constitutional rights. At this point, a justiciable issue will be presented to the courts. Meanwhile, however, petitioners' hypothetical argument cannot be decided, nor can it affect the basic constitutional fairness of the approved plan.

In the case at bar we are only considering whether the proposed plan comports with the constitutional mandate on equal protection of the law. We are not passing on the propriety or the efficacy of the standards that Congress wishes to impose by way of administrative fiat on the receipt of federal funds. The H.E.W. regulations are designed to change from time to time as conditions dictate or warrant. Our current task is only to assess the proposed plan in the light of its reasonableness and efficacy in providing a non-racially operated school system that accords equal protection of the law to all students regardless of race. We think the plan as proposed could reach this goal. The operations of the local systems are vested in the local Boards and not the Courts. The Respondent Board is under a constitutional mandate and a specific court order, approved by this Court to operate a racially nondiscriminatory school system.

The District Court has jurisdiction to oversee and check the operation of any plan and with its equitable powers may issue any order necessary to bring the plan up to constitutional standards in its concept and in its performance. If the present plan is not so administered as to bring about at this time a racially nondiscriminatorily operated school system, the Courts must, upon application, take steps to apply more rigid and stronger sanctions to the offending Board. This, we do not feel is called for at this time. We hope it will not be necessary in the future, but if additional equitable decrees are necessary, they will be forthcoming.

Petition for rehearing is denied.