**Brenda EVANS et al., Plaintiffs,**

v.

**Madeline BUCHANAN et al.,
Defendants.**

**Civ. A. Nos. 1816–1822.**

United States District Court,
D. Delaware.

July 12, 1974.

Louis L. Redding, Irving Morris, and Joseph A. Rosenthal, Cohen, Morris & Rosenthal, Wilmington, Del., for individual plaintiffs.

Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., Frederick H. Altergott, Asst. City Sol., Wilmington, Del., for intervening plaintiffs, the Bd. of Ed. of the City of Wilmington.

William Prickett, and Mason E. Turner, Jr., Prickett, Ward, Burt & Sanders, Wilmington, Del., for defendants.

Briefs of amici curiae were filed by John P. Sinclair, Potter, Anderson & Corroon, Wilmington, Del., for the Delaware School Boards Association, L. Coleman Dorsey, Bader, Dorsey & Kreshtool, Wilmington, Del., for the Urban Coalition of Metropolitan Wilmington, John S. Grady, Bader, Dorsey & Kreshtool, Wilmington, Del., for the Delaware Region, National Conference of Christians & Jews.

Before GIBBONS, Circuit Judge, and WRIGHT, and LAYTON, District Judges.

## OPINION

LAYTON, District Judge:

This case is the most recent stage of the litigation concerning desegregation of the public schools of Delaware. The plaintiff class, Negro school children, and the intervening plaintiff, the Wilmington Board of Education, have instituted this action against the State Board of Education and the State Superintendent of Public Instruction. The plaintiffs contend, in a three-part cause of action, that black children in Wilmington are being compelled to attend segregated schools. First, plaintiffs allege that the defendants maintain a racially discriminatory dual public school system in New Castle County, including Wilmington, in violation of the Fourteenth Amendment's equal protection clause and of the outstanding orders of this Court. Second, they contend that the Educational Advancement Act of 1968, 14 Del.C. § 1001 et seq., which provides for school district consolidation and boundary changes in Delaware,* unconstitutionally confines Wilmington

---

* The Educational Advancement Act was passed by the Delaware Legislature "to provide the framework for an effective and orderly reorganization of the existing school districts of this State. . . ." 14 Del.C. § 1001. To that end, § 1004 provided a means whereby the State Board of Education could adopt and implement during 1968 a plan of reorganization of school districts. Section 1004(c)(4) specifically excluded Wilmington from being included in such plan. "The proposed school district for the City of Wilmington shall be the City of Wilmington with the territory within its limits." Also, §

1004(c)(2) effectively excluded the Wilmington School District from the plan by limiting pupil enrollment in any proposed new district to 12,000, 3,000 less than in the district at that time. Section 1026 specifically excluded Wilmington from a provision setting out the mechanism for changing or altering boundary lines after the plan was adopted and implemented. Section 1027 sets out a referendum mechanism for consolidating reorganized school districts; plaintiffs contend that it excludes the Wilmington School District by implication.

students to attendance at schools within the city limits. Plaintiffs allege that the statute both unconstitutionally classifies the City of Wilmington as a single school district and prevents the State Board from implementing its duty under the orders of this Court to dismantle the dual school system. Interwoven into the above contentions is a third argument, that the State of Delaware through its laws, customs, usages and policies has enforced, approved of, or acquiesced in public and private discrimination resulting in segregated schools.[1]

This Court has retained jurisdiction over the case in order to implement its orders designed to dismantle the dual school system in Delaware. See, Evans v. Ennis, 281 F.2d 385, 391 (3rd Cir. 1960). Plaintiffs further assert jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3). This three-judge court was empanelled pursuant to 28 U.S.C. § 2281 because plaintiffs seek to have a state statute declared unconstitutional.

*Background*

Historically, Delaware required its public school pupils to attend segregated schools. Prior to the landmark decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), (*Brown I*), the Delaware Supreme Court ordered the immediate admission of black children to certain schools previously attended only by white children. Gebhart v. Belton, 33 Del.Ch. 144, 91 A.2d 137 (Del.S.Ct. 1952). On appeal to the United States Supreme Court, the decision was consolidated with *Brown I*, and the Supreme Court found that racial segregation of public school students deprives the minority group children of equal educational opportunities in violation of the equal protection clause. *Gebhart* was affirmed in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed.

1083 (1955), (*Brown II*), and remanded to the Supreme Court of Delaware for further proceedings to require "a prompt and reasonable start toward full compliance" with *Brown I* and "to effectuate a transition to a racially nondiscriminatory school system." 349 U.S. at 300–301, 75 S.Ct. at 756.

During the interim between the two *Brown* decisions, the State Board of Education formulated a policy looking toward the gradual desegregation of the public schools. See Steiner v. Simmons, 35 Del.Ch. 83, 111 A.2d 574, 581–582 (Del.S.Ct.1955). The Delaware Supreme Court approved of this policy for the interim period and held that no school district could lawfully desegregate more rapidly than the State Board permitted. Steiner v. Simmons, *supra*.

In 1957, the plaintiff class petitioned this Court for relief from the failure of the Clayton School District to admit Negro students on a racially nondiscriminatory basis or to submit a desegregation plan to the State Board of Education. This Court permanently enjoined both the State Board of Education and the Clayton School District to admit members of the class and further ordered the State Board to submit a plan for the integration of the Clayton school in question. Evans v. Member's of the State Board of Education, 149 F.Supp. 376 (D.Del.1957).

In Evans v. Buchanan, 152 F.Supp. 886 (D.Del.1957), this Court consolidated six cases, found that no appreciable steps had been taken to effectuate compliance with *Brown I* and *II*, and granted the plaintiffs' motions for summary judgment against the State Board of Education, the Superintendent of Public Instruction, and various individual districts. The Court permanently enjoined the individual school districts from refusing to enroll members of the plaintiff class. The Court further ordered the State Board to submit a plan of desegre-

---

1. At the pretrial conference this Court agreed with Counsel to dispose of this litigation in two phases, first whether there has been a violation of plaintiffs' constitutional rights and, if so, a consideration of the possible remedies.

gation "providing for the admittance, enrollment and education on a racially nondiscriminatory basis, for the Fall Term of 1957, of pupils in all public school districts of the State of Delaware which heretofore have not admitted pupils under a plan of desegregation approved by the State Board of Education." 152 F. Supp. at 889. On appeal, the decision was affirmed, Evans v. Buchanan, 256 F.2d 688 (3rd Cir. 1958).

The State Board submitted a plan which provided for desegregation on a grade by grade basis over a period of 12 years. This plan was eventually rejected, and the Board was ordered to develop a "modified plan which will provide for full integration of all grades of the public schools of Delaware commencing with the Fall term 1961." Evans v. Ennis, 281 F.2d 385, 390 (3rd Cir. 1960).

In 1961, this Court approved with certain modifications the revised plan submitted by defendants.

The mandate of the Court of Appeals envisages two separate but parallel streams flowing concurrently toward the same goal, a 'wholly integrated' school system in which all students compelled by law to attend Delaware public schools will receive education on a racially nondiscriminatory basis. Part (A) of the plan must allow Negro students desiring integration to transfer immediately to white or integrated schools as a matter of right subject only to the usual and nondiscriminatory processing of the school system. Part (B), however, looks to the future and must provide for the ingredients of a wholly integrated system. It must further look to the interim period when the number of Negro students desiring integration increases and provide adequate facilities and procedures to accommodate them. Evans v. Buchanan, 195 F.Supp. 321, 322–323.

Pursuant to part (B) of the Plan, the defendants were to submit and recommend a proposed new school code to the General Assembly of the State of Delaware. 195 F.Supp. at 325.[2] The desirability of a new school code, including provisions for consolidation of school districts, had long been recognized. See, Steiner v. Simmons, 111 A.2d at 580. Although a new school code was recommended to the General Assembly, no legislation ensued in the early 1960's. Tr. 2026–39, 2589–90.

Most recently, this Court held in Evans v. Buchanan, 207 F.Supp. 820 (1962), that where the plaintiffs make a prima facie case of racially discriminatory school attendance zones, the local and state school boards have the burden of demonstrating that no discrimination has taken place. In that case, the State Board of Education and the Rose Hill-Minquadale Board failed to justify the attendance zones they had promulgated, and the Court ordered the admission of minority children to a school outside their established attendance zone.

### Proper Party Defendant

The threshold question at this stage of the case is whether the State Board of Education is the proper party defendant. The Board has raised this issue at virtually every stage of the desegregation process and each time the issue has been resolved against it. The State Board of Education has historically had a broad responsibility for maintaining the statewide system of free public schools. Steiner v. Simmons, 35 Del.Ch. 83, 111 A.2d 574 (Del.S.Ct.1955). In Steiner v. Simmons, the Delaware Supreme Court noted that desegregation began in the Wilmington School District only after the "necessary permission" was granted by a resolution of the State Board. 111 A.2d at 581. Since that time, this Court and the Court of Ap-

2. Nothing in the opinion, or in the order approving the State Board's plan as modified, DX–143, exempted the Wilmington schools from the requirement that all students receive education on a racially nondiscriminatory ba-sis. It is true, however, that Exhibit B to the plan, a proposed list of school districts to be consolidated, did not provide for the consolidation of Wilmington with any other district.

peals have repeatedly held that the duty to desegregate Delaware Schools rests primarily with the Board. Evans v. Members of the State Board of Education, 149 F.Supp. at 378 (D.Del.1957); Evans v. Buchanan, 152 F.Supp. at 887 (D.Del.1957), aff'd, 256 F.2d 688, 693–694 (3rd Cir. 1958); 281 F.2d 385, 391 (3rd Cir. 1960); Evans v. Buchanan, 207 F.Supp. at 825 (D.Del.1962). Recently, the Legislature reaffirmed this broad authority of the State Board in the Educational Advancement Act and Sections 121 and 122 of the revised code. 14 Del.C. §§ 121, 122.

 Accordingly, it is well established that to the extent that any schools in the state are in violation of *Brown* and its progeny or of this Court's orders, the State Board must bear primary responsibility. The fact that the Wilmington Board of Education is an intervening plaintiff and alleges discrimination which it, as well as the State Board, was empowered to alleviate does not diminish the constitutional obligation of the defendants to provide a nondiscriminatory system of education for the children of this state.

### Defendants' Duty

 Under *Brown*, the Board's duty was to "effectuate a transition to a racially nondiscriminatory school system." 349 U.S. at 301, 75 S.Ct. at 756. To this end, it has the affirmative duty to eliminate from the public schools "all vestiges of state-imposed segregation." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). The goal is a unitary school system, a "system with-

out a 'white' school and a 'Negro' school, but just schools." Green v. County School Board of New Kent County, 391 U.S. 430, 442, 88 S.Ct. 1689, 1696, 20 L. Ed.2d 716 (1968). When this Court accepted with certain modifications the proposed plan presented by the State Board, it made clear an additional requirement—that the plan would carry out the Board's constitutional duty only to the extent that it was effective. 195 F.Supp. at 325.[3] It is against these standards that the desegregation of the schools in New Castle County must be measured.

### The Desegregation Process in Wilmington

The Wilmington Public Schools presently have an enrollment of 14,688 pupils, of whom 83% are black and 14% are white. Of the 22 schools in the city, 11 have virtually all-black (94–100%) enrollments and one has a virtually all-white (89%) enrollment. When the desegregation process began 20 years ago, the Wilmington schools had an enrollment of 12,875 pupils, of whom 28% were black and 72% white.[4] In short, schools in Wilmington, as in many other American cities have experienced the phenomenon of "white flight" during the past two decades.

Following *Brown I* and the authorization from the State Board "to proceed with the development of plans for the integration of city schools," the Wilmington Board of Education began a three-step program of desegregation. DX 11. For the 1954–55 school year, geographic attendance zones were established around each elementary school

---

3. The Supreme Court similarly noted in Green v. County School Board, "whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed." 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716. Underlying the notion that the Court will retain jurisdiction pending an evaluation of the desegregation plan in prac-

tice is a recognition that the courts, and particularly the Supreme Court, are in an ongoing process of defining the duty to dismantle the dual school system and the remedial measures to be taken in the process. See Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. at 6, 91 S.Ct. 1267, 28 L.Ed.2d 557.

4. PX 6.

and the existing policy of allowing, if space were available, transfers to schools outside the attendance area at the request of parents was continued.[5] Provisions were also made for desegregation of the summer school, practical nursing, and evening school programs, and limited desegregation was adopted for special education and high school vocational education. DX 11. For the 1955–56 school year, the Wilmington Board established attendance areas around the junior high schools for the seventh grade, while eighth and ninth grade pupils continued on in the same schools in which they had originally enrolled. DX 21.[6] For the 1956–57 school year, high school students were required to attend the school within their attendance area. Tr. 1426. The bulk of the official desegregation program in Wilmington was thus completed by the 1956–57 school year. Defendants contend that this program fulfilled any duty under *Brown*, that the dual system was thereby dismantled, and that a unitary system has been established in Wilmington. They point out that Wilmington was one of the first, if not the first school district in Delaware to desegregate, and that many school officials proceeded under the assumption that the dual system had been abolished.[7]

Despite the fact that the Wilmington Board adopted facially neutral geographic attendance zones, Wilmington continued to have many racially identifiable schools. Under the desegregation plan implemented by the Wilmington Board, all of the pre-*Brown* colored schools that remained open continued to be operated as virtually all-black schools. As the following chart indicates, in the period from 1956 to 1973, no de jure black school had a black enrollment of less than 91% in any year.[8]

■■ The presence of racially identifiable schools in a formerly de jure system is always constitutionally suspect. Swann v. Charlotte-Mecklenburg, 402 U.S. at 18, 26, 91 S.Ct. 1267. It is apparent not only that all of the de jure black schools in Wilmington have remained identifiably black, but also that these schools constitute a substantial proportion of the 22 public schools in Wilmington. This Court can only conclude that the presence of these schools is a clear indication that segregated schooling in Wilmington has never been eliminated and that there still exists a dual school system. Keyes v. School District No. 1, Denver, Colo., 413 U.S. 189, 200–201, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), United States v. Texas Education Agency, 467 F.2d 848, 888 (5th Cir. 1972). The desegregation plan for Wilmington has not been effective, and this Court must conclude that a unitary school system has never been established.[9] Consequently, the defend-

---

5. This "free transfer" policy continued throughout the desegregation process.

6. However, the white pupils living in the attendance area of the Bancroft Junior High School, a de jure black school, were not required to, and evidently did not attend that school. PX 145, report by Superintendent of Wilmington Public Schools dated January 16, 1956; PX 6.

7. See, e. g., Muriel Crosby, An Adventure in Human Relations (1965), DX 165; Tr. 2583–84.

8. The chart is derived from PX 6 and Tr. 1358–69. No statistics for the enrollment at individual schools are available for years prior to 1956.

| School | % Black Pupils | | Range, 1956–73 |
|---|---|---|---|
| | 1956 | 1973 | |
| Elbert Elementary | 91% | 100% | 91–100% |
| Stubbs Elementary | 100% | 98% | 95–100% |
| Drew Elementary | 99% | 99% | 93– 99% |
| Bancroft Junior High | 98% | 95% | 95– 99% |
| Howard High | 100% | 97% | 95–100% |

9. This is not the first time that this Court has made clear that allegedly neutral attendance zones having the probable result of continuing the dual school system are impermissible. See Evans v. Buchanan, 172 F. Supp. 508, 516 (1959); 173 F.Supp. 891 (1959), 207 F.Supp. 820, 825 (1962).

ants will be required to come forward with plans to remedy the existing segregation, as set forth below.

Having found a violation of the rights of the plaintiff class, we need not now consider whether Sections 1004, 1026 and 1027 of the Educational Advancement Act are violative of the Equal Protection Clause and whether, as plaintiffs also charge, the State of Delaware through its laws, customs, usages and policies has enforced and approved of both public and private racial discrimination resulting in racially segregated schools.

■ Moreover, we find premature plaintiffs' remaining contention that the just mentioned sections of the Educational Advancement Act are per se unconstitutional because, in result, they defeat any attempt to formulate an effective system of unified education within the boundaries of the district. It is now clearly established that a state legislature cannot impose any restriction upon a school board's authority to create a unified system of education in the public schools.

> " . . . if a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual system, it must fall; . . . "
> Board of Education v. Swann, 402 U.S. 43, 45, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971).

However, at this point, we are not in a position to say whether or not by the employment of such accepted techniques as a substantial realignment of student attendance and teacher and staff personnel ratios, more fully integrated student extra-curricular activities, and the like, a plan cannot be devised which, despite the heavy imbalance of black students in the Wilmington School District, would satisfy existing constitutional requirements.

## Remedy

The answer to this important question must await the remedy stage. The central issue in that phase of the litigation will be whether an effective remedy for the continuing school segregation in Wilmington may be found within the existing boundaries of the Wilmington School District. Accordingly, the defendants will be required to submit to this Court not later than September 15th alternate desegregation plans (a) within the present boundaries of the Wilmington School District, and (b) incorporating other areas of New Castle County. The plaintiffs may also submit alternative desegregation plans within the same period.

■ In drawing up their plans, the parties are admonished to "make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." Davis v. School Commissioners of Mobile County, 402 U.S. 33, 37, 91 S. Ct. 1289, 1292, 28 L.Ed.2d 577 (1971).

This opinion will be deemed to constitute findings of fact and conclusions of law. Because of the result here reached, we feel it unnecessary to pass upon the numerous objections to the admission of evidence made at trial and the question of where lies the burden of proof.

Submit order.

GIBBONS, Circuit Judge (concurring and dissenting in part).

I concur in Judge Layton's opinion to the extent that it holds:

(1) that the State Board of Education is the proper party defendant, and bears primary responsibility for the elimination of segregated schooling;

(2) that it is the defendants' duty to effectuate a transition to a racially nondiscriminatory school system which has eliminated all vestiges of state-imposed segregation;

(3) that the Wilmington Public School System has not been desegregated;

(4) that the State Board defendants must come forward with plans to remedy the existing segregation.

I dissent, however, from the court's holding that consideration of the constitutionality of the Educational Advancement Act, 56 Del.Laws, ch. 292, § 6, is premature and from the further holding that we are postponing until the remedy stage of this case a determination as to whether a desegregation plan must look beyond the boundaries of the City of Wilmington. The record before us establishes the unconstitutionality of certain features of the Educational Advancement Act, and establishes, as well, that elimination of all vestiges of state-sponsored segregated schooling in Delaware requires relief not confined to the City of Wilmington.

## I. The Governing Legal Standards

We are dealing with a state-sponsored educational system which was formerly, as recently as 1967,[1] segregated by race de jure, as well as de facto, at least in part. In states which at the time of Brown v. Board of Education (*Brown I*), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) operated legally mandated dual school systems, the mere removal of the legal requirement, or even the formal adoption of racially neutral criteria, is insufficient compliance with the fourteenth amendment. States like Delaware have the affirmative duty to establish a unitary school system in which all vestiges of the formerly legally required racial segregation have been eliminated root and branch. *Brown I* did not deal with the matter of remedy. But in Brown v. Board of Education (*Brown II*), 349 U.S. 294, 300–301, 75 S.Ct. 753, 756–757, 99 L.Ed. 1083 (1955) the defendants were directed "to achieve a system of determining admission to the public schools on a nonracial basis," to "effectuate a transition to a racially nondiscriminatory school system," and "to admit [the parties] to public schools on a racially nondiscriminatory basis with all deliberate speed." The states formerly segregated by law, Delaware included,[2] reacted to *Brown II* by assuming that some formally neutral pupil placement arrangement like free transfer or freedom of choice would satisfy the Supreme Court's mandate even though in practical effect the schools remained segregated. Reactions in the courts of appeals varied.[3]

In Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) the Court held that school boards operating dual systems compelled by law

"were [in *Brown II*] . . . clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch

---

1. *See* page 1232 *infra.*

2. The State Board of Education was between *Brown I* and *Brown II* firmly committed to a policy of gradualism. Steiner v. Simmons, 35 Del.Ch. 83, 96–99, 111 A.2d 574, 581–583 (Sup.Ct.1955). After *Brown II* the policy of gradualism continued. This court approved the State Board's grade-by-grade desegregation plan in Evans v. Buchanan, 172 F.Supp. 508 (D.Del.1959), but the Third Circuit reversed, Evans v. Ennis, 281 F.2d 385 (3d Cir. 1960), cert. denied, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365 (1961).

3. *Compare* Green v. County School Board, 382 F.2d 338 (4th Cir. 1967), vacated and remanded, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Monroe v. Board of Commissioners, 380 F.2d 955 (6th Cir. 1967), vacated and remanded, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Kelley v. Altheimer, Arkansas Public School District No. 22, 378 F.2d 483 (8th Cir. 1967); Clark v. Board of Education, 374 F. 2d 569 (8th Cir. 1967); and Bradley v. School Board, ·345 F.2d 310 (4th Cir.), vacated and remanded on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965) with United States v. Jefferson County Board of Education, 372 F.2d 836 (5th Cir. 1966), aff'd en banc, 380 F.2d 385 (5th Cir.), cert. denied, 389 U.S. 840, 88 S. Ct. 67, 19 L.Ed.2d 103 (1967), and Kemp v. Beasley, 352 F.2d 14 (8th Cir. 1965).

. . . . . .

The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*.

. . . The matter must be assessed in the light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. . . . Of course, the availability to the board of other more promising courses of action may indicate a lack of good faith; and at the least it places a heavy burden upon the board to explain its preference for an apparently less effective method." *Id.* at 437–439, 88 S.Ct. at 1694.

In *Green* and its companion cases, Raney v. Board of Education, 391 U.S. 443, 447–448, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968) and Monroe v. Board of Commissioners, 391 U.S. 450, 458, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968), moreover, the Court made it clear beyond question that the state educational officials having the legal responsibility for achieving compliance with the mandate of *Brown II* could not, by adopting what on the surface appeared to be a neutral pupil placement arrangement, merely "burden children and their parents with a responsibility which *Brown II* placed squarely on the School Board." 391 U.S. at 441–442, 88 S.Ct. at 1696.

*Green, Raney* and *Monroe* involved so called free choice or free transfer plans which did not achieve the same degree of desegregation as could have been achieved by geographic attendance zones. Swann v. Charlotte-Mecklenburg

Board of Education (*Swann I*), 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) and Davis v. Board of School Commissioners, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971) made clear that neither the responsible state education officials nor the district courts could, by relying on what on the surface appeared to be neutral geographic attendance zones, avoid the affirmative duty which *Brown II* placed on them. As Justice Burger concluded for the unanimous Court, "[t]he measure of any desegregation plan is its effectiveness." 402 U.S. at 37, 91 S.Ct. at 1292.

North Carolina State Board of Education v. Swann (*Swann II*), 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971) further refines the duty of the responsible state officials. In affirming the decision of a three-judge district court [4] holding unconstitutional N.C.Gen.Stat. § 115–176.1 (Supp.1969), the Court unanimously held that:

" . . . if a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees.

The legislation before us flatly forbids assignment of any student on account of race or for the purpose of creating a racial balance or ratio in the schools. The prohibition is absolute, and it would inescapably operate to obstruct the remedies granted by the District Court in the *Swann* case. But more important the statute exploits an apparently neutral form to control school school assignment plans by directing that they be 'color blind'; that requirement, against the background of segregation, would render illusory the promise of Brown v. Board of Education, 347 U.S. 483, 74

---

4. Swann v. Charlotte-Mecklenburg Board of Education, 312 F.Supp. 503 (W.D.N.C.1970).

S.Ct. 686, 98 L.Ed. 873 (1954)." 402 U.S. at 45–46, 91 S.Ct. at 1286.

*Swann II* makes clear that restrictions imposed by state law upon the authority of state officials having the affirmative duty imposed by *Brown II* are unconstitutional to the extent that they interfere with the achievement of fully effective desegregation of formerly dual systems.

By 1971, then, it was established that state school officials could not avoid the affirmative duty to root out vestiges of de jure desegregation (1) by resort to facially neutral pupil placement plans (*Green, Raney, Monroe*), (2) by resort to facially neutral geographic attendance zones (*Swann I, Davis*), or (3) by reliance upon state legislation purporting to limit their authority (*Swann II*). The next foot-dragging efforts took the form of changing the supposedly responsible officials by realigning the geographic boundaries of school districts. In Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L. Ed.2d 51 (1972) and United States v. Scotland Neck City Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972) the Court closed that door. In *City of Emporia* Justice Stewart wrote:

"The effect of Emporia's proposal was to erect new boundary lines for the purpose of school attendance in a district where no such lines had previously existed, and where a dual system had long flourished. Under the principles of *Green* and *Monroe*, such a proposal must be judged according to whether it hinders or furthers the process of school desegregation. If the proposal would impede the dismantling of the dual system, then a district court, in the exercise of its remedial discretion, may enjoin it from being carried out.

· · · · · ·

. . . [A]n inquiry into the 'dominant' motivation of school authorities

is as irrelevant as it is fruitless. The mandate of *Brown II* was to desegregate schools, and we have said that '[t]he measure of any desegregation plan is its effectiveness.' Davis v. School Commissioners of Mobile County, 402 U.S. 33, 37, [91 S.Ct. 1289, 28 L.Ed.2d 577.] Thus, we have focused upon the effect—not the purpose or motivation—of a school board's action in determining whether it is a permissible method of dismantling a dual system. The existence of a permissible purpose cannot sustain an action that has an impermissible effect." 407 U.S. at 460, 462, 92 S.Ct. at 2202.

In *City of Emporia* the actual effect, whether or not it was intended, was to withdraw a group of city schools with a more or less equal racial balance, leaving behind a group of county schools which would have been 72% black. This effect, in the context of a formerly dual system where vestiges of that system remained, was impermissible.

What *City of Emporia* and *Scotland Neck City Board of Education* add to *Swann II*, it seems to me, is that just as a state-imposed limitation on the responsible school board's authority for pupil placement must be disregarded, so also a state-imposed limitation on the responsible school board's geographic area of responsibility must be disregarded, if either limitation has the effect of preventing the elimination of all vestiges of state-imposed segregation. A gerrymander of school district lines in a state where a dual system flourished will be judged by its effects on desegregation and not by whatever nonracial motivations were behind it. As I will point out hereafter, the Educational Advancement Act has precisely the effects prohibited by *Swann II* and *City of Emporia*.

There is considerable evidence in this record directed to the actual motivation for those provisions of the Educational Advancement Act which permanently

fixed the boundaries of the Wilmington School District. Were I required to make a finding as to motivation the task would be difficult. Undoubtedly the Supreme Court's continuous direction to the federal courts from *Swann I* to *City of Emporia* that the test is effect not motivation reflects that Court's recognition that an inquiry into legislative motivation inevitably is difficult. As I read the cases, the presence or absence of a benign legislative motive is not relevant to our inquiry. Undoubtedly there were valid educational reasons for enacting the Educational Advancement Act. Possibly there were political considerations of a nonracial character which dictated the inclusion of provisions fixing the boundaries of the Wilmington School District. Certainly the Delaware executive and legislative leaders responsible for the legislation were fully aware in 1968 of the racial makeup of the Wilmington and suburban New Castle County Schools. Separating such knowledge from their total motivation is hardly easy. But if the effect of the provisions fixing the boundaries of Wilmington is to prevent desegregation of white schools outside the city and black schools within, we need look no further.

## II. The Delaware Context

### A. The Existence of Vestiges

Involved in this case is a state in which segregation was formerly imposed by law. This court finds, unanimously, that vestiges of that dual system remain in the City of Wilmington.[5] Judges Wright and Layton make no findings, however, with respect to schools outside

5. Five of Wilmington's all-black schools under the pre-*Brown* dual system remain as vestiges of that state-imposed dual system:

| Pre-*Brown I* all-black dual system schools in Wilmington * | Present Status | 1956 ** | % Black Pupils Range | 1973 |
|---|---|---|---|---|
| No. 5 | Replaced by Stubbs | | | |
| No. 20 | Closed 1955 or 1956 | | | |
| No. 29 | Replaced by Stubbs | | | |
| Douglas | Closed 1954 | | | |
| Drew (built 1953 or 1954) | Open | 99.3% | 93–99% | 99.1% |
| Elbert (built 1931) | Open | 90.8% | 91–100% | 99.7% |
| Stubbs (built 1953 or 1954) | Open | 100.0% | 95–100% | 98.3% |
| Bancroft J.H.S. (built 1926, converted to black school 1953) | Open | 97.7% | 95–99% | 95.1% |
| Howard H.S. (built 1929) | Open | 100% | 95–100% | 97.3% |

* Sources: PX 6, PX 95, testimony of Dr. Gordon Foster, tr. 1358–69.
** 1956 is the first year that figures for individual schools are available. Thus in the period from 1956 to 1973 when the percentage of black enrollment throughout the Wilmington School District increased from 31.6% to 82.7%, no black dual-system school in Wilmington remaining open had black enrollment of less than 90% in any year.

but within a short distance of Wilmington. In suburban Wilmington the form- erly all white schools remain identifiably white by any relevant measure.[6] Thus

## % Black Enrollment (PX 6)

| Year | Drew | Elbert | Stubbs | Bancroft J.H. | Howard H.S. | % black pupils in the Wilmington School District |
|------|------|--------|--------|---------------|-------------|------|
| 1956 | 99.3 | 90.8 | 100.0 | 97.7 | 100.0 | 31.6 |
| 1957 | 97.6 | 91.1 | 98.0 | 96.7 | 100.0 | 34.9 |
| 1958 | 98.6 | 91.2 | 98.7 | 98.0 | 99.6 | 37.7 |
| 1959 | 98.5 | 94.7 | 99.0 | 96.8 | 99.4 | 41.7 |
| 1960 | 93.3 | 96.2 | 99.4 | 97.7 | 99.8 | 45.0 |
| 1961 | 95.4 | 96.0 | 99.4 | 97.9 | 99.5 | 47.6 |
| 1962 | 94.3 | 96.3 | 98.3 | 96.8 | 99.6 | 50.6 |
| 1963 | 94.3 | 96.8 | 95.2 | 98.8 | 100.0 | 54.5 |
| 1964 | 94.3 | 97.0 | 97.8 | 98.4 | 99.8 | 57.1 |
| 1965 | 95.2 | 97.0 | 96.5 | 98.1 | 99.5 | 60.1 |
| 1966 | 96.2 | 91.8 | 97.7 | 97.5 | 99.5 | 62.4 |
| 1967 | 99.3 | 99.1 | 96.6 | 96.5 | 99.6 | 65.8 |
| 1968 | 98.3 | 99.3 | 97.7 | 98.9 | 99.8 | 69.2 |
| 1969 | 98.2 | 99.8 | 97.7 | 98.7 | 100.0 | 75.5 |
| 1970 | 97.8 | 99.7 | 98.4 | 99.0 | 96.3 | 78.9 |
| 1971 | 97.8 | 100.0 | 97.0 | 99.0 | 100.0 | 79.8 |
| 1972 | 98.2 | 99.7 | 98.4 | 99.1 | 94.7 | 81.1 |
| 1973 | 99.1 | 99.7 | 98.3 | 95.1 | 97.3 | 82.7 |

The enrollment in Howard High School is particularly significant since prior to *Brown I* it served black students from outside the City of Wilmington and was clearly identified statewide as the black high school.

6. In New Castle County only in the Wilmington, Appoquinimink and De La Warr districts are there any significant black enrollments. In those districts there existed pre-*Brown I* de jure black schools, whose enrollments have been absorbed. In the other New Castle County districts the enrollment picture on September 30, 1973 was as follows (PX 15):

| District | American Indian No. | % | Black No. | % | Oriental No. | % | Spanish Surnamed No. | % | White No. | % |
|----------|------|---|-----------|---|--------------|---|----------------------|---|-----------|---|
| Alexis I. duPont | 2 | .1 | 107 | 3.2 | 26 | .8 | 35 | 1.0 | 3,145 | 94.9 |
| Alfred I. duPont | 10 | .1 | 45 | .4 | 100 | .9 | 16 | .1 | 11,080 | 98.5 |
| Claymont | 2 | .1 | 110 | 3.0 | 11 | .3 | 11 | .3 | 3,512 | 96.3 |
| Conrad | 0 | .0 | 147 | 2.4 | 9 | .1 | 28 | .5 | 5,920 | 97.0 |
| Marshallton-McKean | 5 | .1 | 203 | 4.9 | 2 | .1 | 14 | .3 | 3,915 | 94.6 |
| Mount Pleasant | 3 | .1 | 72 | 1.3 | 35 | .6 | 19 | .4 | 5,295 | 97.6 |
| New Castle County Voc.-Tech. (county-wide) | 3 | .2 | 142 | 9.8 | 0 | .0 | 7 | .5 | 1,303 | 89.5 |
| New Castle-Gunning Bedford | 13 | .1 | 461 | 5.0 | 16 | .2 | 68 | .7 | 8,698 | 94.0 |
| Newark | 15 | .1 | 613 | 3.7 | 68 | .4 | 77 | .5 | 15,704 | 95.3 |
| Stanton | 1 | | 26 | .4 | 39 | .7 | 36 | .6 | 5,764 | 98.3 |

Enrollment percentages for individual schools in each of these districts are comparable, as are the percentages with respect to racial composition of school staffs. The districts which are in close geographic proximity to residential areas of Wilmington include Alexis I. duPont, Alfred I. duPont, Claymont, Conrad, Marshallton-McKean, Mount Pleasant and De La Warr. A unitary treat-

it is not only in Wilmington that vestiges remain.

B. Delaware's Unique State Board Involvement

The Delaware State Board of Education has historically had broad responsibility for maintaining the statewide system of free public schools which, since 1898, has been required by article X, § 1 of the Delaware Constitution, Del.C.Ann. *See* Evans v. Buchanan, 256 F.2d 688, 693–694 (3d Cir. 1958), cert. denied, 358 U.S. 836, 79 S.Ct. 58, 3 L.Ed.2d 72 (1958). Responsibility at the state level for public education has been assumed in Delaware to an extent far greater than in any other state to which we have been referred. We are dealing, it must be remembered, with a small geographic area and a small population. New Castle County, with which we are primarily concerned, occupies only 435 square miles, and in the entire county 87,696 [7] students were enrolled in September 1973. Thus the entire county, in which thirteen school districts (one county-wide) have been organized, is smaller geographically and has approximately the same enrollment as the Charlotte-Mecklenburg district which was involved in *Swann I* and *Swann II*.[8] The State of Delaware provides on the average 70% of the funds required to operate local school districts. Of the balance, 7% represents funds provided by the federal government, and 23% is made up of funds raised from local taxation. State funding is divided into three categories. Division I funds (salaries), Division II funds (all other costs), and Division III funds (equalization). In addition State funds are used for school maintenance, capital improvements and pupil transportation. Division I funds for salaries are allocated in accordance with schedules and formulas set by the State Board of Education. Division II funds are allocated on a flat per pupil basis. Division III equalization funds are allotted pursuant to a weighted formula designed to equalize the financial resources of the separate school districts. In addition to the Division I, II and III funds the State pays the entire cost of pupil transportation.

ment of these districts, for example, would have produced a single district with the following enrollment:

| District | American Indian | Black | Oriental | Spanish Surnamed | White | Total |
|---|---|---|---|---|---|---|
| Alexis I. duPont | 2 | 107 | 26 | 35 | 3,145 | 3,315 |
| Alfred I. duPont | 10 | 45 | 100 | 16 | 11,080 | 11,251 |
| Claymont | 2 | 110 | 11 | 11 | 3,512 | 3,646 |
| Conrad | 0 | 147 | 9 | 28 | 5,920 | 6,104 |
| Marshallton-McKean | 5 | 203 | 2 | 14 | 3,915 | 4,139 |
| Mount Pleasant | 3 | 72 | 35 | 19 | 5,295 | 5,424 |
| Wilmington | 5 | 12,141 | 1 | 477 | 2,064 | 14,688 |
| De La Warr | 3 | 1,783 | 0 | 37 | 1,815 | 3,638 |
| Total | 30 | 14,608 | 184 | 637 | 36,746 | 52,205 |

The resulting black percentage would have been slightly under 28% as contrasted with Wilmington's 82.7%. The districts referred to comprise a relatively compact metropolitan area, with many school facilities located near the borders of existing districts. The only significant barrier is that erected by the Educational Advancement Act. There are no geographic barriers.

----------◆----------

7. In the two other counties in Delaware the enrollments are Kent 25,760 and Sussex 19,484. The total state enrollment, 132,940 is smaller than in many single school districts in other states. Of 27,648 black students enrolled statewide, 12,141 are enrolled in Wilmington schools.

8. The Charlotte-Mecklenburg system covered 550 square miles and served over 84,000 pupils. 402 U.S. at 6, 91 S.Ct. 1267.

The State pays 60% of the approved cost of any major capital outlays. It also makes an annual appropriation of not in excess of $50,000 per project for minor capital improvements. Vocational and other special education facilities are paid for entirely from State funds. The State pays the cost of insurance on all school buildings and a share of Social Security contributions and Blue Cross premiums for school employees. The State pays the cost of debt service on State bonds issued for major school construction projects. All educational expenditures, including salaries for school employees are paid by check drawn by the State Treasurer on a single State dispository. The State Department of Education exercises strict control over the approval, location, size, and cost of all major capital improvements desired by a local school board. The State Department of Education prepares the specifications for any such project before it is submitted to a referendum to authorize the issuance of bonds for the local share of the project's cost. The State purchases, at a private sale, local district bonds issued for the local share. The State Board of Education requires extensive reports on local school educational and financial operations and in particular on the racial and ethnic make-up of each school's enrollment. The State Board of Education sets criteria for teacher certification. School taxes are State taxes. The State carries on numerous programs in which local school district lines are disregarded. These include programs for the physically handicapped and the retarded, vocational education, and education for unwed pregnant girls and mothers.

During the time the State operated a de jure dual system there were some all black local school boards whose members were appointed by the Governor and whose geographic attendance zones overlapped one or more white school board attendance zones. At the same time in some geographic areas, such as Wilmington, a single board of education operated separate black and white schools.

In both instances 100% of the financing of the black schools was by the State. The black schools, and in particular Howard High School in Wilmington, served students from a geographic area far beyond the borders of the Wilmington School District. Under the dual system the black schools were essentially a single statewide system, although the exact pattern of operation varied from one locality to another. Under the dual system the white schools were also essentially a single statewide system, although the exact pattern of operation varied from one locality to another, and although the Wilmington School District, operating under a legislative charter separate from the charter of the City of Wilmington, had a greater degree of autonomy to impose higher standards of teacher certification than did other local school boards. The Wilmington School Board operated the black schools as a part of a statewide black school system. Moreover prior to 1956 some school districts in suburban New Castle County did not offer a full range of educational services for white students and many white suburban students attended white high schools in Wilmington.

The degree of State rather than local autonomy over public education in Delaware at the time that the State defendants came under the affirmative duty imposed by *Brown II* is best illustrated by *Steiner v. Simmons*, 35 Del.Ch. 83, 111 A.2d 574 (Sup.Ct.1955), to which Judge Layton makes reference and by the regulations (DX–15) of the State Board to which that opinion refers, 35 Del.Ch. 95–97, 111 A.2d at 380–382. Desegregation attempts by local school boards without the necessary permission of the State Board were forbidden. This included the Wilmington School Board. *Steiner v. Simmons*, 35 Del.Ch. at 96, 111 A.2d at 581. As Judge Layton points out, this court and the Third Circuit have repeatedly held that the duty to desegregate Delaware schools rests upon the State Board, which more than in any state with which I am fa-

miliar operates a statewide but racially segregated system of public education. This is not a Richmond [9] or a Detroit [10] case.

### C. The 1968 Situation

The Educational Advancement Act was enacted in 1968. Prior to its enactment the State defendants had last been before this court with respect to a desegregation plan on June 26, 1961. Evans v. Buchanan, 195 F.Supp. 321 (D. Del.1961).[11] At that time the two-part desegregation plan referred to in Judge Layton's present opinion was approved by Judge Wright. The principal element of part "(B)" of the plan, which looked to the future, was submission by the State Board to the Delaware General Assembly of a new school code which would eliminate all distinctions in public education based on race. *Id.* at 325. The court retained jurisdiction. The State Board defendants appear to have made good faith *efforts* to comply with part "(B)" of the approved plan. Legislation was introduced in the General Assembly in 1961 (DX 146) and 1963 (DX 148). In each instance the legislation failed to be enacted. (tr. 2074–82). Meanwhile de jure segregation continued in Delaware in the form of separately chartered state-financed black school districts. The State Board attempted by various administrative pressures to cause the trustees or board members of these black school districts to convey the district properties to the white school district in the same geographic area and then to dissolve with the State Board's approval. The State Board was seriously hampered in that effort by an Opinion of the Attorney General of Delaware (DX 149) to the effect that black teachers and supervisors would, if the black school districts dissolved, come into the white districts without tenure. This re-

quired negotiation over job security. Despite that difficulty, however, in June of 1967 the last de jure black school district was dissolved. But this court finds unanimously that vestiges of de jure segregation continued in Delaware in 1967 and in 1968 and remain today.

The summer of 1968 was in Delaware a period of rather intense racial tension, and probably was as unpropitious a time for the enactment of a new school code which would accomplish what was required by this court's June 26, 1961 decree as any time since issuance of that decree. The State Board was, however, still under the affirmative duty mandated by *Brown II* and that decree. There was another difficulty. In addition to the affirmative duty imposed by *Brown II* and the June 26, 1961 decree, there was the practical necessity for bringing order out of a chaotic situation in which, outside Wilmington, small local school boards, often offering limited programs, had over the years proliferated. Article X, § 1 of the Delaware Constitution has been interpreted by the Delaware Supreme Court to require that a legislative change in the boundaries of a school district must be made by a general law applicable to all districts. The Wilmington Board of Education was created by a legislative charter which defined its boundaries. *See* 23 Del.Laws ch. 92, § 1 (1905). There were, indeed, many school districts created by such special legislation. In order to consolidate the smaller districts, which must be accomplished by a general law, the legislation had to apply to all districts, large and small, including Wilmington. The draftsmen of the 1968 legislation concluded that the task of defining actual school boundaries would, during a one-year period, be delegated to the State Board of Education. There is no question that any school district lines, in-

---

9. Bradley v. School Board, 462 F.2d 1058 (4th Cir. 1972) (en banc), aff'd by an equally divided Court, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973).

10. Bradley v. Milliken, 484 F.2d 215 (6th Cir. 1973) (en banc), cert. granted, 414 U.S.

1038, 94 S.Ct. 538, 38 L.Ed.2d 329 (U.S. 1973).

11. *See also* Evans v. Buchanan, 207 F.Supp. 820 (D.Del.1962) ordering admission of 9 black students into a substantially white school.

cluding those of the Wilmington School District, could have been changed by such general legislation. Opinion of the Justices, 246 A.2d 90, 92 (Del.1968). In re School Code of 1919, 30 Del. 406, 108 A. 39 (1919). As the proposed legislation was originally drafted it apparently did not contemplate any restriction on the authority of the State Board to change geographic lines of the Wilmington district. *See* PX 203. At some point in the drafting process a provision was inserted limiting school district enrollment to 15,000 and then to 12,000 pupils. Defendant Madden explained to members of the State Board that "[a] limit of 12,000 pupils was inserted to avoid consolidating any other districts with Wilmington." (PX 154A). The draftsmen also eventually included the language now found in '14 Del.C. § 1026(a), permanently fixing the boundaries of the Wilmington district, and in 14 Del.C. § 1004(c)(4) excluding Wilmington from the jurisdiction of the State Board in the one-year period during which that Board could act to change district lines.

What took place in 1968 was a general statewide reorganization of the statewide system of public education which reconstituted every school board, including Wilmington as a reorganized district. *See* 14 Del.C. § 1005. This was done at a time when many schools in Wilmington continued to be identifiable as black schools and most schools in the surrounding New Castle County continued to be identifiable as white schools. The effect—and that is as far as we need look—was exactly the same as in Wright v. Council of City of Emporia, *supra*. The State Board of Education which had the affirmative obligation of carrying out the mandate of *Brown II* was effectively prevented from doing so.

### III. Conclusion

The provisions of the Educational Advancement Act of 1968 which prevented the State Board of Education from eliminating the vestiges of state-imposed segregated schooling in the City of Wilmington and in the surrounding suburban areas are unconstitutional. The State Board should be ordered to submit a plan for desegregation of city and suburban schools disregarding those provisions. The majority's result, which proposes to consider a plan for sprinkling Wilmington's few remaining white students among its overwhelmingly black schools will not achieve desegregation of the essentially unitary Delaware statewide system of public education so long as most schools in surrounding districts remain identifiably white.