**Brenda EVANS et al., Plaintiffs,**

**v.**

**Madeline BUCHANAN et al., Defendants.**

**Civ. A. Nos. 1816–1822.**

United States District Court
D. Delaware.

April 24, 1959.

Louis L. Redding, Wilmington, Del., for plaintiffs.

Januar D. Bove, Jr., Atty. Gen. of State of Delaware, for State Bd. of Education, et al.

James M. Tunnell, Jr., Wilmington, Del., and James H. Hughes, III, Dover, Del., for Milford Sp. School Dist., et al.

Everett F. Warrington, Georgetown, Del., for Milton Sp. School Dist., No. 8.

Max Terry, Dover, Del., for Caesar Rodney Sp. School Dist.

LAYTON, District Judge.

The chronological legal background of these cases is fully set out in Evans v. Buchanan, D.C.Del. July 15, 1957, 152 F.Supp. 886 and Evans v. Buchanan, 3 Cir., July 23, 1958, 256 F.2d 688.

It is sufficient here to say that on May 17, 1954, the Supreme Court of the United States declared that racial discrimination in the public school systems was unconstitutional, Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and on May 31, 1955, by a supplemental opinion, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, announced that the primary responsibility for solving the many local problems which would inevitably arise from integration must rest upon the local school boards so long as they acted in good faith.

In the cases before me, a group of Negro children, through their guardians, brought class actions for injunctions in this Court to require their admission to the public schools of Delaware on a racially nondiscriminatory basis. The State School Board defended upon the ground that many local boards had refused to follow its directives as to integration and that it was powerless to enforce them upon what it conceived to be autonomous bodies. Judge Leahy granted summary judgment against the defendants holding that the defendant, State Board, had complete authority over the actions of the local boards and directing the former to file a plan of desegregation on a state-wide basis within a stated time. The Third Circuit Court of Appeals affirmed. The time for the filing of the plan having expired pending the appeal, a supplemental order was entered on November 19, 1958, which together with minor amendments thereto, directed that the State Board of Education submit a plan of desegregation to this Court within 112 days,

**510**

and setting a hearing thereon on Tuesday, March 17, 1959.[1]

A plan has now been prepared and submitted in accordance with the requirements of the order. In simple terms, it provides for desegregation of the Delaware Public School System on a grade by grade basis over a period of twelve years beginning with all first grades at the Fall term, 1959. A three day hearing was held upon the plan followed by the filing of briefs and oral argument.

In its first opinion in Brown v. Board of Education of Topeka, briefly mentioned above, the Supreme Court stated that [347 U.S. 483, 74 S.Ct. 692]:

> " * * * the plaintiffs * * * are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment."

And in its second opinion it was held that [349 U.S. 294, 75 S.Ct. 756]:

> " * * * School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles * * *."

> " * * * Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitu-

tional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner * * *.

> " * * * Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems * * *."

The plan of the State Board is the only one before me for consideration. Neither the plaintiffs nor any other interested party has offered an alternative. The plaintiffs apparently take the position that they are under no duty to offer a plan—rather, that it is the burden of the State Board to prepare a plan which, in all respects, must meet the requirements of the Brown cases. With this I agree. But to the extent that the plaintiffs at times seem to contend that no plan other than one calling for total desegregation is contemplated by the Brown decisions, I disagree. The language of the two opinions plainly permits a more gradual transition if the circumstances require.

Conditions which, if fairly found to exist, would call for something less

---

1. The order provided for the submission of a tentative plan to the local boards to be followed by further discussion and, thereafter, the preparation and submission of a final plan.

than full and immediate desegregation are (1) the problem of additional buildings or classrooms and teaching personnel in a given locality due to an increase in enrollment; (2) the difficulties attending the reshuffling of the extensive school transportation system because of the relocation of students in different schools; (3) the closing of some schools entirely and the merging of others into more convenient districts together with the drafting, presentation and passage of legislation without which certain of these objectives cannot be satisfactorily solved; (4) the financial burden occasioned by new buildings and additional personnel which will fall in part upon local taxpayers and in part upon the State; (5) the problem of meshing substantial numbers of Negroes into a hitherto all white school system where the educational achievement level of the former is significantly lower than that of the latter and (6) the impact of integration upon a predominantly Southern society.[2] The plaintiffs have objected to this latter consideration as irrelevant. I do not agree. My reasons will appear fully hereafter.

Before considering the plan itself, it is appropriate to state that, in my judgment, any thought of a total and immediate integration of the Delaware School System is out of the question. I agree fully with the testimony of the witnesses in this respect.

The question may then well be asked why consideration should not be given to the immediate desegregation of some large segment of the System, such as the elementary or secondary grades.[3] In this connection, it can be fairly said that the present high school situation in the lower Counties is particularly open to criticism insofar as concerns segregation because in Sussex County, for instance, there is but one colored high school located in Georgetown in the central part of the County with the result that large numbers of colored students daily are transported by bus long distances (up to 25 miles) to school only to have to face the same long return trip at the day's end. And, in so doing, many of them may pass a white high school close to their own homes. Even so, there are convincing reasons why total desegregation of the high schools should not be attempted now. From testimony of Dr. Miller, supplemented by an exhibit

2. The two lower Counties, Kent and Sussex, are bounded by Maryland on the South and West, New Castle County on the North and the Delaware River, Bay and Atlantic Ocean to the East. This area lies opposite Washington and Northern Virginia. Historically, it held to the Union during the Civil War but, nevertheless, approximately 1,550 slaves then existed in the Southern Counties. It is almost exclusively an agricultural area and with the exception of Dover, Milford and Seaford, the population of no town exceeds three thousand. It is populated with numerous farms, small and large, and with villages and small towns, the latter of which derive most of their income from agriculture and its derivatives. In its manners, customs and thinking, this area is noticeably Southern in character. Segregation exists in nearly all aspects of its social life. While white and colored not infrequently work side by side, a rigid segregation exists in the schools, churches and to only a slightly lesser extent in restaurants. In the motion picture theaters, the colored sit in one side or another of the balconies. There are separate parent-teacher associations connected with the schools, and segregation exists in such organizations as Kiwanis, American Legion and the like. Separate bathing is generally recognized at bathing beaches. As said in American Mercury, July—Dec. 1950, "There are two Delawares separated from each other by an imaginary extension of Mason & Dixon's line. In Delaware, the line is without political significance but this is the one place where it perceptibly separates North from South. Northern Delaware is urban, industrial and hilly. Southern Delaware is rural, agricultural and flat as a bowling alley. The farmers of Southern Delaware are as Dixie-oriented as their neighbors on the Eastern Sho' of Maryland; * * *."

3. Generally speaking, the Delaware Schools are divided into the elementary grades, 1–6, and the secondary grades, 7–12, of which grades 7 and 8 are classified as Junior High School.

introduced by the State Board, it is possible to present a fair picture of some of the problems which arise as the result of such a plan.

### High Schools Including Junior High

|  | Present White | Additional Negroes | Per Cent Increase | Can Handle More |
|---|---|---|---|---|
| Caesar Rodney | 877 | 85 | 10% (very crowded now) | No |
| Smyrna | 544 | 134 | 25% | No |
| Milford | 853 | 163 | 18% (very crowded now) | No |
| Harrington | 333 | 37 | 9% | Yes |
| Dover | 995 | 252 | 25% (crowded now) | No |
| Seaford | 812 | 194 | 25% (crowded) | No |
| Rehoboth | 227 | 33 | 7% | Yes |
| Lewes | 393 | 103 | 26% | No |
| Laurel | 629 | 151 | 26% | No |
| Georgetown | 483 | 126 | 25% | Possible |
| Millsboro | 306 | 128 | 42% | No |
| Selbyville | 250 | 80 | 32% | No |

Overcrowding is clearly indicated, but that is only one of the problems. Overcrowding creates the need for additional rooms, additional teaching personnel and additional facilities of many other sorts. While only a few estimates are given,[4] the increased cost for the construction and operations budgets would obviously be very substantial. The cost of the former would fall on an unwilling citizenry and of the latter on a state rapidly approaching a bad financial crisis.

Moreover, aptitude tests are in evidence indicating that the academic achievement levels of the Negro are significantly lower[5] than those of white students of corresponding age. To force integration at the high school level would pose yet another serious problem, i. e., at the expense of the white students to downgrade existing academic standards to a level capable of being met by the average Negro or to maintain existing standards which, through no fault of their own, many of the Negroes could not presently meet.

Finally, but not of least importance, is the emotional strain upon the whole educational system as the result of an immediate desegregation of any substantial segment of the school system, such as the high schools, in a predominantly Southern society. This may come about through forces operating both from within and without the school system. By the high school age, prejudice has unfortunately had ample time to take root. These prejudices will inevitably make themselves felt in the classrooms. As an example of how similar tensions may be stirred up from without, we have the testimony of Dr. Madden, the Superintendent of the Seaford Schools, who stated:

"That is right, sir. We had one meeting [held by Bryant Bowles] near our district, and the following day there seemed to be a vicious rumor circulated that the Seaford Board of Education had accepted

4. New construction at Caesar Rodney would cost $240,000 and Millsboro in excess of $150,000.

5. It is worth noting that while Dr. Clark, plaintiffs' expert psychiatrist, was able

to demonstrate that the defendants' exhibit tending to show that the Negro children had a substantially lower I.Q. than the white was of little significance, yet he failed to mention the achievement tests.

colored students into the school. We had parents coming to the school that day and taking their children out of school. We had children roaming the halls, leaving classrooms at will with utter disregard for teacher control or discipline, without regard to anything I had to say, the principal of the school, and then even to the point of having a representative group of people come into the school and roam the school at will until I called them into my office to ask what the disturbance was, and confronted with this statement that they understood there were colored students admitted to the school. I asked them to produce any evidence. They, of course, could do nothing but say that this was hearsay evidence, and the group then decided to leave, after convincing themselves apparently that there were no colored students admitted. But for the next several days after this the general excitement and the turmoil was such that administrative control was very difficult."

The same considerations above discussed preclude any thought of an immediate integration of the first six elementary grades. Again, from Defendants' Exhibit 4, it is possible to demonstrate the result in a few, selected situations:

| | Additional Negroes | Approximate Per Cent Increase | | Approximate Cost of New Building |
|---|---|---|---|---|
| Houston | 48 | (grades 1–8) | 39% | $60,000. |
| Kenton | 49 | | 52% | $60,000. |
| Bridgeville | 261 | over | 70% | Probably nearly $200,000. |
| Ellendale | 79 | | 62% | $60,000. |
| Millsboro | 264 | over | 65% | Probably over $250,000. |
| Selbyville | 155 | | 60% | Over $200,000. |

As can be seen from this study, many more students, teachers and facilities would be involved than at the high school level. The difference between the academic achievement potentials of the two races, while less pronounced, would begin to appear at the fifth and sixth grade age and the resentment of the community would be equally strong.

Even the thought of desegregating immediately some portion of the elementary grades presents definite problems, although obviously of a much lesser degree. The variation in the achievement potentials between the two races is not too significant at the third grade level, for instance, nor does racial prejudice usually exist at that early stage. Nevertheless, Dr. Simpson, Superintendent of the Caesar Rodney School testified that " * * * to add students from the Star Hill (colored) School would certainly overcrowd the facilities that are already overcrowded." And judging from Defendants' Exhibit 4, if the first three grades were now desegregated, the enrollment of Kenton School #9 would be increased 26%, Ellendale over 25%, Millsboro about 33% and Bridgeville as much as 35%.[6] Again, examples may be multiplied.

Even so, I suppose it would be possible to integrate the first three grades immediately. Statistics may be variously interpreted. The point is debatable. The State Board does not feel so. It has an advisory staff composed of experts in the field. They know the problems involved both from the point of view of education, administration and finance. Many of these gentlemen, Dr.

6. Approximate figures arrived at by dividing in half certain of the estimated increased enrollments taken from Defendants' Exhibit D.

Madden, Superintendent of the Seaford Schools, for example, come from areas wholly free from racial prejudice. To a man they agree that any plan calling for integration on any wider scale than the one here proposed would be a mistake. Under such facts, for me to substitute my judgment for theirs would not only offend familiar legal principles but would, in effect, imply lack of good faith on the part of the State Board of Education.

Bad faith has been charged. To the contrary, the State Board acted with considerable courage in attempting to take over the operation of the Milford Schools under a plan of integration put into effect immediately after the announcement of the first decision in Brown v. Board of Education of Topeka. The deep and lasting animosities, threats of violence and damage to school morale occasioned by that unfortunate incident, to the embarrassment of us all, have become a matter of record in the public press throughout the entire country. Ultimate responsibility is a heavy burden as only those who have had it can appreciate. Knowing what has happened not only in Delaware but elsewhere, and understanding the temper of the Southern Counties, the Board in the best of faith, I am certain, devised a plan, which in its judgment would both get desegregation under way at once and, at the same time, create the least possible opposition. Under such circumstances, any imputation of bad faith must be rejected.

What has just been said not only raises an important aspect of the integration question which should be met head-on but also illustrates my reason for overruling the plaintiffs' objections to the admission of evidence as to the effect of desegregation upon a predominantly Southern society.

The plaintiffs protested strenuously against the admission of such evidence upon the ground that it is wholly irrelevant to the issue here and cited the following language from Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5, 19, the so-called "Little Rock case", in justification of their position:

"The constitutional rights of respondents are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and Legislature. * * * Thus law and order are not here to be preserved by depriving the Negro children of their constitutional rights."

Read in its proper context, no one would presume to disagree. Here, however, we are faced, not with the question of whether there shall be integration at all, but with deciding the most sensible way of carrying out what is already an accomplished fact. Theoretically, a Court should be very slow to uphold or to reject a plan of desegregation based upon fear, and fear alone, of its effect upon a hostile community. Thus, the threat of desegregation on a wide scale in a section where racial prejudices exist may cause neighbors to cease speaking, threats of violence, mass meetings of protest and misguided individuals disguised in sheets to burn crosses on people's lawns. Standing alone, this might be said to be a regrettable community problem quite irrelevant to a consideration of whether or not a given plan of integration is reasonable. The difficulty is, that as a practical matter, such demonstrations can never stand alone. Inevitably, they overflow into the classroom and then we have a Little Rock, a massive resistance movement or another Milford incident. As a result, the schools are filled with emotional stresses and strains, some classes are suspended indefinitely, while others limp along in an atmosphere of tension and hostility seriously interfering with the process of learning. Violence and open disrespect for law and order flourish on the school grounds and who is the loser? The students, both Negro and white, or in other words, the cause of education, which is so vital to the free world today that the Supreme Court of the United States in Brown v. Board of

Education of Topeka, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 said this:

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."

Surely, the public interest would be better served by a gradual plan which would go a long way toward eliminating the possibility of another setback to the cause of education in Delaware such as the Milford [7] incident. And a frank recognition of this fact should certainly be a relevant factor in determining whether or not a given plan is reasonable and practicable.

The community feeling is relevant in another fashion also. It has been testified to that before total integration is completed, it will become necessary to re-divide the State schools into a more orderly system of districts. Who will do this? The legislature, a majority of whom are from the Southern Counties and who, being human, will vote for a piece of legislation only if it pleases them. New classrooms and buildings will be needed in the near future costing many hundreds of thousands of dollars. Where will this money come from? As pointed out earlier, it must be raised by means of a local referendum wherein the citizens bind themselves to higher taxes. This Court has wide powers but among them is not the power to compel taxpayers from a predominantly Southern society to vote substantial additional taxes upon themselves for a proposition so unwelcome as desegregation.

All this demonstrates very plainly that unless the public is in back of the plan, the cause of education will suffer in the long run. A more convincing reminder of this fact could scarcely be imagined than the testimony of James M. Rosbrow who appeared as a witness in this case. It deserves to be quoted, but the testimony might lose some of its weight if it were not first stated that Mr. Rosbrow is a scholarly, articulate and public-spirited citizen, vitally interested in the cause of education. A Jew, he is utterly impatient with segregation in any form and as a member of the New Castle School Board, in 1954, he led his Board in pushing through a plan of integration even before the mandate of the Supreme Court in Brown v. Board of Education of Topeka was handed down. Yet, as President of the Delaware Congress of Parents and Teachers, he has, of necessity, traveled widely throughout the lower part of the State and become familiar with local problems and local feelings. A portion of his testimony follows:

"* * * in terms of my own knowledge and in terms of the people with whom I have talked, in terms of the meetings I have attended and the very careful, soul-searching I have done, I believe that the plan proposed by the State Board is a sound workable plan for Delaware and Kent and Sussex Coun-

---

7. Following the first opinion in Brown v. Board of Education of Topeka, the Milford School Board attempted an immediate plan of desegregation. The community instantly rebelled. Mass meet- ings, Ku Klux Klan demonstrations and other threats of violence occurred under the leadership of one Bryant Bowles. The schools were closed down completely for some time.

ties. I believe it is the type of plan that will rally to its support the decent-thinking people of Kent and Sussex Counties. I think it is of tremendous importance that a matter of this grave impact to the community shall have community support. I say again, sir, that in all sincerity I wish it were possible, and I wish I thought it were feasible, that a twelve-grade plan should work forthwith. This I believe in. But on the other hand I don't want to see another Milford incident if anything I can do can help that. I don't want to see another Bryant Bowles given hospitality in the State of Delaware. I feel that this great wrong which has continued so long can better be remedied in such manner as to have true community acceptance by being allowed to go forward on a gradual basis."

To summarize, a careful consideration of all the material factors involved in effecting an orderly desegregation of the school system convinces me that any plan calling for the immediate desegregation of all the State schools or of any large segment of the system, such as the high schools, or the first six grades, would be wholly unfeasible. Reasonable minds may differ on the question of whether a plan calling for the immediate integration of the first three grades would be justified. However, there is unrefuted testimony from experts that it would not, and on top of this there is the almost certain knowledge that any kind of severe plan would be bitterly resented with unfortunate consequences to the whole school system. Under such circumstances, for a Court to attempt to substitute its judgment for that of the State Board of Education would amount to an unwarranted abuse of judicial discretion.

The plan will be approved with the exception of two paragraphs which in my opinion should be eliminated.

Paragraph 4 of the plan says this:

"Whenever possible, every pupil in the grades affected, beginning with the start of the fall term, 1959, and in additional grades as the program expands in succeeding years shall have the choice of (a) attending the nearest school within the district in which he resides or (b) attending the school he would have attended prior to the effective date of this order."

Now, it is a fact that in Georgetown, for example, the majority of the Negroes live in a community known as The Hill. The colored school is close by. The white school is at a much greater distance. Interpreting the language of paragraph 4 in the light of these facts, it would seem to result that no Negro student whose family resides on The Hill may ever enter the white school. Whatever may have been the reasons for this provision, it strikes me as unfair and is ordered to be stricken.

Paragraph 5 of the plan, in effect, provides that no white student intending to enter the first grade of school at this Fall term need register but that all Negro children must do so. No one seems to remember just how or why this paragraph crept into the plan. I am sure that it was not intended to be discriminatory but it savors of discrimination and should be eliminated.

Finally, there remain for disposition the arguments advanced by the Milton Special School District No. 8 and the Caesar Rodney Special District that the plan should be amended to the extent that where, in the judgment of a local school board, the integration of the first grade this year, or of any grade hereafter, would cause unnecessarily crowded conditions, then the grade need not be desegregated until the needed facilities are provided. The short answer to this is that the power to delay, resting in unfriendly hands, is tantamount to the power to defer interminably or to defeat altogether. This request must be rejected. An order will be entered directing that an amended plan be submitted within 30 days in accordance with this opinion.