Brenda EVANS et al., Plaintiffs,

v.

Madeline BUCHANAN et al., Defendants.

Civ. A. Nos. 1816, 1822.

United States District Court,
D. Delaware.

Dec. 27, 1976.

---

Louis L. Redding, Irving Morris, and Joseph A. Rosenthal, of Morris & Rosenthal, Wilmington, Del., for individual plaintiffs.

Louis R. Lucas, of Ratner, Sugarmon & Lucas, Memphis, Tenn., Richard Allen Paul, Wilmington, Del., for intervening plaintiffs, The Board of Education of the City of Wilmington.

William Prickett, and Mason E. Turner, of Prickett, Ward, Burt & Sanders, Wilmington, Del., and Philip B. Kurland, Chicago, Ill., for defendant.

John P. Sinclair, and William Poole, of Potter, Anderson & Corroon, Thomas S. Lodge, of Connolly, Bove & Lodge, Sheldon N. Sandler, of Bader, Dorsey & Kreshtool, Samuel R. Russell, of Biggs & Battaglia, Edward W. Cooch, Jr., of Cooch & Taylor, Jerome O. Herlihy, of Herlihy & Herlihy, Clifford B. Hearn, of Balick & Hearn, Wilimington, Del., Christian White, Stephen R. Spiller, Aida Waserstein, and Peter Siegel, James T. McKinstry, of Richards, Layton & Finger, James M. Tunnell, Jr., and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Howard M. Handelman, of Bayard, Brill & Handelman, and William H. Bennethum, Wilmington, Del., for intervenors and amici.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

The defendant Delaware State Board of Education has petitioned this Court for a stay of an Order entered on June 15, 1976 by a three-judge court. The Order directs the development and implementation of a plan to desegregate most school districts in Northern New Castle County. Defendant's motion is the latest in the lengthy litigation concerning racial discrimination in the public schools of the State of Delaware.[1]

The most recent phase of the litigation involves the scope of the court-ordered remedy for past unconstitutional discrimination. In 1974, the three-judge court[2] unanimously held that the State Board of Education had failed to eliminate the existence of the previously de jure segregated school system in Northern New Castle County.[3] The court asked the State Board to submit

1. Reported decisions, which span 20 years, are *Evans v. Members of the State Board of Education,* 145 F.Supp. 873 (D.Del.1956); *Evans v. Members of the State Board of Education,* 149 F.Supp. 376 (D.Del.1957); *Evans v. Buchanan,* 152 F.Supp. 886 (D.Del.1957); *Evans v. Buchanan,* 256 F.2d 688 (3d Cir. 1958); *Evans v. Buchanan,* 172 F.Supp. 508 (D.Del.1959); *Evans v. Buchanan,* 173 F.Supp. 891 (D.Del.1959); *Evans v. Ennis,* 281 F.2d 385 (3d Cir. 1960); *Evans v. Buchanan,* 195 F.Supp. 321 (D.Del. 1961); *Evans v. Buchanan,* 207 F.Supp. 820 (D.Del.1962); *Evans v. Buchanan,* 379 F.Supp. 1218 (D.Del.1974); *Evans v. Buchanan,* 393 F.Supp. 428 (D.Del.1975); *Buchanan v. Evans,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975); *Evans v. Buchanan,* 416 F.Supp. 328 (D.Del.1976).

2. Members of the three-judge court were Circuit Judge Gibbons and Senior District Judges Wright and Layton.

3. The court concluded that the presence of racially identifiable schools in a formerly de jure system was a "clear indication" that segregat-

alternative desegregation remedies, one limited to the boundaries of the existing Wilmington school district and the other incorporating other school districts in Northern New Castle County. The court declined to reach two questions raised by plaintiffs: (1) whether the Delaware Educational Advancement Act, which expressly precluded the State Board from considering the district of Wilmington in any plan for consolidation of school districts, was unconstitutional; (2) whether the State of Delaware through law, customs, usages and policies had enforced, approved of or acquiesced in public and private discrimination resulting in segregated schools.[4]

Before the requested plans could be submitted to the court, the Supreme Court decided *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).[5] In light of *Milliken*, the court gave the suburban New Castle County school districts an opportunity to intervene and present evidence. All of the districts that intervened adopted the State Board's pleadings and the evidence of record. Additional argument was heard by the court on the issue of whether it should consider metropolitan as well as Wilmington-only school desegregation remedies. The court concluded that an inter-district remedy would be appropriate, based on its findings that:

1) there had been a failure to alter the historic pattern of inter-district segregation in Northern New Castle County;

2) governmental authorities at the state and local levels were responsible to a significant degree for increasing the disparity in residential and school populations between Wilmington and the suburbs;

3) the City of Wilmington had been unconstitutionally excluded from other school districts by the State Board of Education, pursuant to a withholding of reorganization powers under the Delaware Educational Advancement Act of 1968.[6]

In the court's order of April 16, 1975, defendant again was directed to submit alternative plans for desegregation within the Wilmington district and throughout the metropolitan area, for the reasons stated in the 1974 and 1975 opinions. The order, appealed to the Supreme Court under 28 U.S.C. § 1253, was summarily affirmed.[7]

After careful consideration of the alternative plans submitted, including three weeks of evidentiary hearings, the court filed a third opinion on May 19, 1976, defining the scope of the necessary remedy.[8] The State Board's instant motion is for a stay of implementation of the order issued pursuant to that opinion.

The court, in its May, 1976 opinion, set forth definitions to be employed in review, if necessary, of student assignments, guidelines for remedying the existence of dual schools and a plan for desegregation of most of the public school districts in Northern New Castle County. The district court plan directed that most of the existing districts in Northern New Castle County be

---

ed schooling in Wilmington had never been eliminated. *Evans v. Buchanan*, 379 F.Supp. 1218 (D.Del.1974).

4. Judge Gibbons, dissenting in part, would have resolved both questions at that point in favor of plaintiffs. 379 F.Supp. at 1224.

5. *Milliken* involved desegregation of public schools in the Detroit metropolitan area. The court found that in Detroit, acts of de jure segregation for the most part were confined to the limits of the Detroit School District, and therefore an inter-district remedy would be improper. *Milliken v. Bradley*, 418 U.S. 717, 744–47, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

6. *Evans v. Buchanan*, 393 F.Supp. 428 (D.Del. 1975). Judge Layton dissented on the finding of an inter-district segregatory effect, based on the *Milliken* holding. 393 F.Supp. at 447.

7. *Buchanan v. Evans*, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975) (Rehnquist and Powell, JJ., and Burger, C. J., dissenting).

8. *Evans v. Buchanan*, 416 F.Supp. 328 (D.Del. 1976) (Layton, J., concurring in part and dissenting in part).

consolidated with grades 7 through 11[9] to attend school in a "genuinely nondiscriminatory system" in September, 1977.[10]

In an effort to minimize federal judicial intrusion, the court explicitly stated that the legislature or State Board of Education could alter or amend the plan proposed by the court in any manner consistent with the findings of the court on the extent of unconstitutional segregation.[11] Thus, the court plan becomes operative only if the State fails to remedy the constitutional violation. Recognizing that there must be governance during the transition period of planning and implementation, the court provided that an Interim School Board be appointed immediately to begin planning for implementation of the court's decision.[12] Full responsibility for the operation of the included public schools is to be transferred either to the Interim Board or to any successor or successors as might be designated by State law, at a date certain prior to September 1, 1977.[13] Until such time, the present individual school boards retain all powers and responsibilities specified under State law.[14]

The defendant school boards filed appeals of the court's decision on remedy with the Supreme Court[15] and with the Third Circuit Court of Appeals. The appeal to the Third Circuit was temporarily stayed pending disposition of the appeal to the Supreme Court. On November 29, 1976, the Supreme Court dismissed the appeal for want of jurisdiction.[16] Defendant has promptly moved to lift the stay of the appeal in the Third Circuit, and to designate the record on appeal. Pending disposition of that appeal, and of any other appellate proceedings, defendant now requests this stay under Rule 8, Fed.R.App.P.

## I. JURISDICTION

Defendant's motion presents a unique jurisdictional question. Although not specifically designated as such, the motion is most reasonably construed as an application for stay of an injunction pending appeal under Rule 62(c), Fed.R.Civ.P. Rule 62(c) provides that:

(c) Injunction Pending Appeal. When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party. If the judgment appealed from is rendered by a district court of three judges specially constituted pursuant to a statute of the United States, no

---

9. Rising seniors, i. e., seniors in the year in which the plan goes into effect, were omitted in implementation of the court's plan.

10. 416 F.Supp. at 356.

11. Id., at 351; Order of June 15, 1976, see ¶ 2.

12. The court ordered the State Board to name the members of the Interim Board, and directed the Interim Board to begin its planning and preparation immediately with respect to issues such as student assignments, taxation of residents, liability to bondholders, contracts with teachers and staff, and title to property in the event of changes to existing school districts pursuant to reorganization. 416 F.Supp. at 357–58.
    The opinion of May 19, 1976, suggested that the Interim Board consist of five members appointed by the State Board of Education from among the existing boards of the component districts. The Delaware General Assembly has recently modified the composition of the Interim Board. Senate Bill No. 796, as amended by Senate Amendment No. 1 (June 25, 1976). The present Interim Board consists of thirteen members appointed by the school boards of the component districts.

13. Order of June 15, 1976, ¶ 3(d). The court was advised at oral argument that an informal date of July 1, 1977, has been set for transfer of authority, but that there has been no formal action by the State Board.

14. 416 F.Supp. at 358.

15. As the matter was heard by a three-judge court, defendant appealed directly to the Supreme Court under 28 U.S.C. § 1253.

16. Delaware State Board of Education v. Evans, —— U.S. ——, 97 S.Ct. 475, 50 L.Ed.2d 579 (1976).

such order shall be made except (1) by such court sitting in open court or (2) by the assent of all the judges of such court evidenced by their signatures to the order.

This case was heard and decided by a three-judge court convened according to 28 U.S.C. § 2281.[17] The language of the last sentence of Rule 62(c) indicates that this motion for stay must, therefore, be heard by the same court. To require that this motion be heard by the three-judge court, however, would be inconsistent with the terms of that court's own decision and order, as well as with the disposition by the Supreme Court of the most recent appeal. In its June 15, 1976 Order, the three-judge court dissolved itself, indicating that jurisdiction over implementation of its order would remain in this court.[18] Although the Court gave no reasons for its finding of want of jurisdiction, one can reasonably speculate that the Supreme Court felt the matter of remedy did not require a three-judge court and, therefore, no right of direct appeal lay from the District Court's decision. Accordingly, since the three-judge court has dissolved itself, it is concluded that under Rule 62(c) this Court may appropriately entertain the present motion.

## II. MERITS

At oral argument, the defendant State Board stated that it does not request a stay of those provisions of the June 15th Order which dealt only with planning and collection of data by the Interim Board or other authorities. Rather, defendant, citing "costly and irreversible" steps it would have to take to implement the plan in the absence of a stay, verbally limited its request to stay of implementation of that portion of the Order which is to be operative in September, 1977.[19]

The request for a stay is addressed to the sound discretion of the court. *Coppedge v. Franklin County Board of Education*, 293 F.Supp. 356, 362 (E.D.N.C.1968); *Hobson v. Hansen*, 44 F.R.D. 18, 21 (D.D.C. 1968). As with any exercise of discretion, the court must balance the equities presented by the particular set of facts. *Taylor v. Board of Education*, 195 F.Supp. 231, 238 (S.D.N.Y.), *aff'd* 294 F.2d 36 (2d Cir.); *cert. denied* 368 U.S. 940, 82 S.Ct. 383, 7 L.Ed.2d 339 (1961). If a stay is granted, and the decision on the merits affirmed on appeal, enforcement of plaintiff's legal rights will have been substantially delayed.[20] If, on the other hand, no stay is granted, but the Order is overturned on appeal, defendant already may have made irrevocable decisions in accordance with the subsequently vacated court order.

The party seeking the stay must show that: 1) it likely will prevail on the merits of the appeal; 2) it will suffer irreparable injury if the stay is denied; 3) other parties will not be substantially harmed by the stay and 4) that no harm will be done to the public interest.[21] *Reserve Mining Co. v. U. S.*, 498 F.2d 1073, 1076–77 (8th Cir.); *application to vacate stay denied*, 419 U.S. 802, 95 S.Ct. 287, 42 L.Ed.2d 33 (1974); *Bauer v. McLaren*, 332 F.Supp. 723, 729

---

17. 28 U.S.C. § 2281 provided that:

    An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

    Section 2281 recently has been repealed by Congress. Pub.L. 94–381 (Aug. 12, 1976).

18. *Evans v. Buchanan*, 416 F.Supp. at 365.

19. *See supra* p. 878, n. 9 and 10.

20. A stay at this point would mean an effective delay of one year in implementation of the plan, since realistically any plan must coincide with the beginning of a new school year.

21. The criteria above are somewhat similar to those considered with respect to the grant of preliminary injunctive relief. *See, A. O. Smith v. F. T. C.*, 530 F.2d 515, 525 (3d Cir. 1976).

(S.D.Iowa 1971); *Friends of the Earth v. Armstrong*, 360 F.Supp. 165, 195 (D.Utah), *vacated on other grounds*, 485 F.2d 1 (10th Cir. 1973), *cert. denied* 414 U.S. 1171–72, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974).

Because of the extraordinary public importance of school desegregation and a history of reluctance to implement desegregation on the part of some school boards, stays of desegregation orders have been granted only rarely. ". . . [A]bsent some extraordinary circumstances, delay in achieving desegregation will not be tolerated." *Jefferson Parish School Board v. Dandridge*, 404 U.S. 1219, 1220, 92 S.Ct. 18, 19, 30 L.Ed.2d 23 (Marshall, Circuit Justice, 1971). *See also, Coppedge v. Franklin County Board of Education, supra ; Taylor v. Board of Education, supra ; but see Medley v. School Board*, 350 F.Supp. 34 (W.D. Va.1972), *remanded on other grounds*, 482 F.2d 1061 (4th Cir. 1973), *cert. denied*, 414 U.S. 1172, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974).

■ The present record does not reflect any reluctance by either the local district boards or the State Board of Education to implement the court's decision. At this point, however, defendant has not made a sufficient showing that it will suffer irreparable injury before the Third Circuit Court of Appeals can decide the pending appeal, or that the Delaware legislature will not take timely action to mitigate what defendant perceives to be the disruptive effect of implementation of the court desegregation plan. At most, defendant has shown that certain decisions will have to be made at some unspecified time prior to July 1, 1977, which would commit the school authorities to irrevocable contractual and statutory obligations. It is conceivable, especially since all parties have represented to this court that they will agree with each other to expedited proceedings in the Third Circuit Court of Appeals,[22] that the appeal could be decided and an application for certiorari filed with the Supreme Court prior[23] to the time when these decisions must be made.

A timely resolution of the appeal would moot defendant's request for a stay. Moreover, as the May 19th opinion makes clear, the General Assembly may act at any point to modify the court's proposed plan.[24] The State Board's argument assumes that the legislature will not act and that the plan outlined in the May 19th opinion will take effect on July 1, 1977. Only if the General Assembly fails to step in with alternative arrangements for desegregation, however, will the local and State boards be required to take the steps outlined by defendant in its motion. Neither the court nor any of the parties can accurately predict the precise course of action the legislature will

---

**22.** The order of the Third Circuit Court of Appeals lifting the stay of the appeals notes that the appeals are "to proceed in accordance with Rule 30(a) and (b) and Rule 31, Federal Rules of Appellate Procedure." (December 20, 1976). Rule 31 provides that the appellant file his brief within 40 days after the date on which the record is filed, the appellee file a reply brief within 30 days after service of appellant's brief, and appellant file any reply brief within 14 days thereafter, "except for good cause shown." It is, of course, unknown whether any party will unilaterally expedite or initiate a request for expedition or how receptive the Third Circuit will be to such a request if it should be made.

**23.** At the hearing on the Motion for Stay, the parties made clear that whoever feels aggrieved by the Third Circuit decision, would apply *for certiorari to the Supreme Court.*

**24.** The Court noted that:

[S]ome reorganization is required. The Court must at a minimum determine the districts which will be included in such a reorganization, and make provisions for the governance of the area in the event that the State officials fail to act. We note that our opinion in this regard is not a final determination of the organization of the area and of the lines to be followed in setting up such an area, as would be the case if we were to order one of the reorganization plans proposed to us. Rather, the reorganization outlined *infra* is effective only in absence of proper state action to change it. 416 F.Supp. at 351.

Further, the Court indicated that problems such as distribution of the tax burden, setting of election periods, and the day-to-day operations of the schools would be left in the hands of the appropriate state and local officials. 416 F.Supp. at 350–352.

take.[25] It is certainly possible that legislative action could obviate the need for many of the decisions which defendant contends must be made prior to July 1, 1977.

In its motion and at oral argument, defendant State Board of Education outlined the following "costly and irreversible" steps which must be taken in order to implement the desegregation plan:

1) Binding decisions whether to renew contracts of approximately 30 to 40 middle-level administrators (out of a total of 200) must be made no later than December 31, 1976, under the terms of those contracts. Failure to send a notice of non-renewal means that the contracts will be automatically renewed for the length specified in the contract, which can be up to five years.

2) No later than May 1, 1977, notices of non-renewal of teachers' contracts for the school year 1977–78 must be sent. If no notices are sent, the contracts will be renewed automatically for that year.

3) Elections of members of the local school boards will be held on either the first Saturday or the first Tuesday of May. Any person wishing to become a candidate for a school board must file 45 days prior to the date of election.

4) As of July 1, 1977,[26] all the component school districts will be consolidated into the new district and will therefore disappear as political entities, unless an alternative plan is passed by the legislature prior to that date.

5) Local tax rates for bonded indebtedness and operating revenues will be abolished and replaced by single rates, thereby effecting a substantial and irrevocable redistribution of the tax burden among taxpayers of the former component districts.[27]

6) Since the May 19th opinion specifically exempts rising seniors and grades 1–6 from the first phase of implementation, the new board will have to provide separate transportation systems for grades 1–6, grades 7–11, and grade 12.

7) Additional school busses must be contracted for in advance of implementation of the plan.

8) New contracts will have to be negotiated with teaching and non-teaching personnel. If the component school districts, which now contract on an individual basis, are consolidated into one large district, the new board may be forced to "level-up" all salaries, which could cost an estimated additional $22,000,000 for the 1977–78 school year.[28]

The only step cited by the State Board which must be taken within the next few months is the decision on non-renewal of the contracts of certain administrators. As the State Board conceded at oral argument, that step alone does not substantially alter the status quo. The other 160 to 170 administrators remain under contract to the component school districts. Those contracts must be assumed by the new board when it assumes full responsibility for the school system, as part of the liabilities of the former districts. There has been no showing that those administrators whose contracts are up for renewal will not be needed in the event that the districts are consolidated, or that contracts could not be made with termination dates to coincide with the realities

---

25. It should be noted that the General Assembly acted promptly to modify the composition of the Interim Board. *See* p. 878, n. 12, *supra.*

26. July 1st is the unofficial date of transfer of authority to the new board. *See* p. 878, n. 13, *supra.*

27. The State Board explained in oral argument that the effective deadline for implementing the new tax rate would be May 15th, the date on which the individual school districts must submit the appropriate tax rate to the State Treasurer.

28. The last two points (7 and 8), while contained in the written motion, were not argued by defendant at the oral presentation of its motion.

of the present situation. The need to make immediate decisions on the retention of those administrators does not warrant a stay.

None of defendant's remaining contentions can support the grant of an immediate stay. The deadline for notice of non-renewal of teachers' contracts is not until May 1, 1977. Even allowing for adequate lead time to make individual evaluations, decisions need not be made for several months. Since the May 1st deadline is specified under state law, the legislature could act in the intervening period to postpone the giving of notice or make alternative arrangements. Assuming that the May 1st date is not changed, defendant has not shown that prior to that date the local school boards will be unable to determine personnel needs for the forthcoming year, based on a cooperative reasonable prediction of the school population in the consolidated district or its successors. Stated differently, presence of pupils requires teachers.

The deadline for filing of nominations for school board positions is not until the middle of March, 1977. If no alternative provisions for school board elections are made by the legislature before then, the local board elections will be held in accordance with state law. Some administrative duplication of effort may be involved if new elections have to be held later for the consolidated board. It is not certain, however, that any new elections will have to be held.[29] Fur-

ther, even if new school board election must be held next summer, this factor would not constitute sufficient reason to justify a stay.

Nor is it certain the political entities will disappear. Consolidation of the component school districts is now informally set for July 1, 1977. That date is not necessarily a final one; nor will the school system necessarily be consolidated and reorganized according to the proposed plan outlined in the May 19th opinion. Implementation of a particular desegregation plan is contingent both on formal action by the Interim Board and on action (or a failure to act) by the state legislature.

There is no evidence in the record to suggest that the transportation systems must be set up, and busses purchased, substantially prior to the summer of 1977. Neither has the State Board introduced any evidence that levelling-up will be necessary at any point, even subsequent to implementation of the plan in September. The Court in the May 19th decision did not determine whether the salaries of teaching and non-teaching personnel would have to be levelled up if the school system is run as a consolidated district.[30] That question has been left to the discretion of the legislature, the Interim Board and "local decision makers."

The requirement that the local school boards set a tax rate to cover bonded in-

---

**29.** The three-judge court stated:

"In ordering reorganization or consolidation of existing districts, we must define who will be charged with the operation of the system on a day-to-day basis. We repeat that the State Legislature and the State Board of Education may take such steps as are not violative of constitutional rights to change the pattern set here. Although the following governance devices should thus be regarded as interim pending such action by the State, they will necessarily remain operative for so long as the State takes no action." 416 F.Supp. at 357.

"The interim board so appointed will be responsible for the operation of the school system in accordance with 14 Del.C. §§ 1041 et seq., until such time as the State may adopt changes. . . ." 416 F.Supp. at 358.

" . . . The appointed members of the new board will serve in their capacity as members until elections for new members can be held in the reorganized districts in accordance with existing state law [footnote omitted] or in new election districts designed by appropriate State authority." 416 F.Supp. at 358.

**30.** In fact, "levelling-up" does not seem to be a substantial issue at this point. The Court notes that in the May 19th decision (416 F.Supp. at 349, n.97), the three-judge court referred briefly to the fact that the State Board had chosen not to recommend levelling-up as part of its reorganization plan on the grounds of the expense involved and the unfavorable public response to bond and tax issues.

debtedness prior to May 15th presents a more serious problem. As of now, the rate is set by each individual district, according to its present funding needs. If the consolidated plan is implemented, defendant contends that the rate would be set on a district-wide basis, resulting in a levelling of the tax burden of all residents of the new district. Once the unitary rate has been set, and the bills sent out to taxpayers by the Treasurer, it would be extremely difficult to restore the status quo, in the event that the June 15th Order is overturned on appeal. Defendant has made no showing, however, that there is any need for a stay of the Order prior to the time such decisions will be made, in April or May, 1977. Again, it is possible that legislative action could provide for a transition which would permit the local districts to set individual rates, or otherwise apportion the tax burden equitably. The Educational Advancement Act, for example, provides for treatment of bonded indebtedness of an existing district which is divided into two or more separate districts.[31] Further, the appellate process could be well on its way to full consummation by the time this problem becomes urgent.

The State and local boards apparently coped successfully with many of the above type of problems in the spring of 1976. The proposed desegregation plans were submitted to the court in August, 1975. The decision of the court came down on May 19, 1976. The school boards had no knowledge that implementation of the remedy would be delayed until the beginning of the 1977 school year. Prior to May 19, 1976, they had to anticipate that the desegregation order would become effective in September, 1976, and had to make decisions on their needs for personnel, physical equipment, and funding accordingly. The success of the school boards in adjusting decisions to account for possible contingencies indicates that the local decision makers could similarly forestall any substantial disruption of the school system by adequate planning. Cre-

ation of the Interim Board has presumably facilitated this planning.

The Court recognizes that the defendants have all acted in good faith in setting up the Interim Board, which is now in the process of collecting information and planning in accordance with the May 19th decision. In addition, the Court sympathizes with the desire of all—students, parents, teachers, administrators, local, State and Interim Boards—to resolve the present uncertainty as rapidly as is humanly feasible. It is obviously much more difficult to make realistic plans and decisions for the fall of 1977 while the present appeal is pending. The question before this Court, however, is not the good faith of defendants, although that is a material consideration. Rather, the question for the Court is whether defendant State Board has made a sufficient showing that it will suffer irreparable injury if the requested stay is not granted at this point. No such showing has been made.

Defendant has also urged the Court to consider the probable success of its appeal, based on its interpretation of the recent decision by the Supreme Court to remand *Austin Independent School District v. U. S.,* —— U.S. ——, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), for reconsideration in light of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Since it has already been determined that defendant has not demonstrated an immediate threat of irreparable injury this issue as well as the other criteria for grant of a stay need not be treated. *Cf. A. O. Smith v. F.T.C.* 530 F.2d 529.

---

31. *See* 14 Del.C. § 1028(d) (1975), noted in *Evans v. Buchanan,* 416 F.Supp. at 351, n.107.